**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARLENE N.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 22 C 5524** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff filed her application for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§416(i), 423, eight and a half years ago in September 2014. (Administrative Record (R.) 160-61). She claimed that she had been disabled since August 29, 2014 (R. 160) due to: "kidney failure, coronary artery disease, immun[o]suppression, depression, high blood pressure, gets ill very easily, difficulty w/memory and concentration." (R. 190). Over the next three and a half years, plaintiff's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. She appealed to the federal district court, and Judge Andrea Wood remanded her case back to the Commissioner on June 18, 2021. (R. 543-64). Her claim was denied by the ALJ once again on July 28, 2022 (R. 466-95), and plaintiff was back in federal court on October 7, 2022. It is the ALJ's most recent decision that is before the court for review. *See* 20 C.F.R. §§404.955; 404.981. The parties consented to my jurisdiction pursuant to 28 U.S.C. § 636(c) on October 20, 2022, and the Executive

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social Security applicant in an Opinion. Therefore, the plaintiff shall be listed using only their first name and the first initial of their last name.

Committee reassigned the case to me. [Dkt. ##10, 11]. Plaintiff asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an Order affirming the decision.

**I.**

**A.**

After an administrative hearing at which plaintiff, represented by counsel, testified, along with a vocational expert, the ALJ determined the plaintiff had the following severe impairments: depression, anxiety, and status post kidney transplant." (R. 472). The ALJ said the plaintiff's other impairments – hypertension, obesity, and C. diff – caused no more than mild limitations and was, therefore, nonsevere. (R. 472-73). The ALJ then found that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that, in terms of plaintiff's mental impairment, she had a moderate limitation in understanding, remembering or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting or maintaining pace; and a moderate limitation in adapting or managing oneself. (R. 474-75).

The ALJ then determined that the plaintiff had the residual functional capacity ("RFC") to medium work with a laundry list of additional limitations:

> [s]he is limited to working in non-hazardous environments, i.e., no driving at work, operating moving machinery, working on ladders or at unprotected heights, and she should avoid concentrated exposure to unguarded hazardous machinery. The [plaintiff] can understand, remember and carry out simple instructions. The [plaintiff] can use judgment to make simple work-related decisions. The [plaintiff] can tolerate occasional interactions with supervisors and coworkers. The [plaintiff] can tolerate no interactions with the general public. The [plaintiff] cannot perform

2

> work requiring a specific production rate such as assembly line work but she can tolerate work that has end of the day quotas. The [plaintiff] can deal with occasional changes in a routine work setting.

(R. 476). Next, the ALJ summarized the plaintiff's complaints. The plaintiff testified that she was working three hours a day as a school recess monitor, taking children in and out for recess, but she didn't think she could that full-time because she got too tired and had to lie down in the afternoon. She said fatigue was the main reason she was unable to work full-time. Plaintiff also said that she has lost interest in things that she used to do, such as reading, swimming, and watching television. Her concentration and memory were bad. She shad crying spells a couple times a week and slept poorly. (R. 477).

The ALJ then found that while the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; . . . the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 477).

The ALJ went on to review the medical record. He noted the plaintiff had had three kidney transplants. In late 2014, plaintiff was complaining of poor sleep, low energy, anxiety, and sadness. She met the criteria for depressive disorder. Psychology and psychiatry notes from February through May 2015 included plaintiff saying she did not want to socialize, that her mood was stable although she sometimes got overwhelmed, that she had no energy and didn't feel well. Plaintiff did take a trip to Florida to visit family and said she had a great time. (R. 478). In July 2015, plaintiff was assessed as having normal mood and affect, but a mild impairment in insight / intellectual insight. In August 2015, she said she planned to go back to work on a part-time basis and did so in

3

September. Through the end of 2015, plaintiff's comments ranged from her life being "nuts" to feeling better and trying not to let her mood get her down. (R. 479).

The ALJ then noted that, in February 2016, plaintiff reported that things were going pretty well for her and that she was working odd jobs at the school. Mental status was normal and she was assessed as mildly depressed. March 2016 nephrology notes show plaintiff's chronic kidney disease was stable, and that plaintiff was feeling well overall, exhibited a normal mood and affect, normal behavior, and normal thought content. In August 2016 therapy notes, plaintiff was diagnosed with major depressive disorder, mild, recurrent, and unspecific anxiety disorder. By September 2016, plaintiff was feeling better and was assessed with an improved mood and decreased anxiety. (R. 479).

That brought the ALJ to 2017. At a January 2017 nephrology visit, the plaintiff complained of depression. She was noted to seem sad, but her behavior, judgment, and thought content were assessed as normal. At a psychiatry session in January 2017, plaintiff said she was more depressed and anxious over the previous two months. A month later, she was doing better and her mood was slightly improving. In July 2017, the plaintiff told her psychiatrist that she was recently fired as a substitute teacher at a school that she had worked at for 10 years, which had caused her mood to decline, but it subsequently improved to a 7 to 8 out of 10. In August 2017, plaintiff was noted to be cooperative and very pleasant, with goal-directed and coherent thought processes and no impairment in insight or judgment. (Ex 10F, 48). In September 2017, plaintiff complained of fatigue at nephrology and psychiatric sessions. Mental status, however, was normal. (R. 479).

Moving on to 2018, the ALJ noted that in a nephrology visit in March 2018 the claimant reported that she was doing well with no complaints, although she said she wanted to take a nap all

the time. Plaintiff had her first psychiatric session in nine months in June 2018 and complained that her mood and anxiety were worse, She was told to consider therapy again. At a nephrology follow-up in September 2018, plaintiff said she was doing fine. In March 2019, she said she felt blasé, and that she forced herself to get up and do things. It was noted that plaintiff had some symptoms of PTSD as she was still affected by being on dialysis at the age of 17 as well as from abuse as a child. Therapy was again recommended. At a June 2019 nephrology follow-up, plaintiff's main complaint was anxiety due to financial issues. In September 2019, she told her psychiatrist that she was feeling a little better, but was still depressed; mental status examination was essentially normal. At the next nephrology follow-up, plaintiff in December 2019, plaintiff reported some abdominal pain and had a normal psychiatric examination. (R. 480).

The ALJ went on to note that plaintiff's next psychiatry session was a telehealth appointment in July 2020, at which the plaintiff complained of increased anxiety (due to COVID-19) and continued poor motivation. She had still not resumed therapy. In September 2020, plaintiff reported her mood and energy had improved in response to medication. In July 2021, plaintiff had a psychiatric evaluation at which she complained decreased energy, and of memory loss and being unable to concentrate. At that time, the plaintiff was diagnosed with mood affective disorder and a mild cognitive impairment. Mental status examination as to her memory was normal. At a follow-up visit, the plaintiff said that she was less distracted was feeling better overall. Mental status was again normal. (R. 480).

In December 2021, plaintiff's kidney function was stable. Treatment notes indicate that plaintiff had ceased psychiatric treatment. The ALJ noted that the record showed pretty conservative and infrequent treatment, and few specific observations other than complaints of fatigue. (R. 480).

5

The plaintiff returned to her psychiatrist in February 2022 after eight months and her medications were adjusted. She reported that she was working 3 hours a day as a lunch aide at an elementary school, and that after work she went home and napped. Plaintiff was diagnosed with major depressive disorder, recurrent, moderate, generalized anxiety disorder, without panic, and PTSD, chronic, mild. At a follow-up psychiatric session visit in May 2022, plaintiff said she was doing okay, but asked about increasing her medication and reported "feeling crunched" at work. The doctor noted plaintiff had an ongoing exacerbation of mood and anxiety symptoms and sleep disturbances due to anxious ruminations and that her treatment was complicated by poor compliance. (R. 481).

The ALJ then assessed the medical opinions in the record. The ALJ noted that, in December 2014 and June 2015, state agency reviewing doctors and psychologists found plaintiff did not have a severe physical mental impairment. The ALJ disagreed, noting that the evidence showed documented depression and anxiety, along with some abnormal mental findings and that the plaintiff was status post her third kidney transplant and was undergoing continued treatment and monitoring, all of which supported a finding that her impairments were severe. (R. 482). The ALJ noted that the plaintiff's nephrologist felt plaintiff would be unable to sustain work due to poor concentration, fatigue, and poor memory due to major depression, that she would have a severe limitation dealing with work stress, and that she would be absent more than three times a month due to impairments or treatment. The ALJ gave the opinion no weight. The ALJ noted that, although the nephrologist was not a mental health specialist, she did prescribe plaintiff psychotropic drugs. The ALJ found that the doctor's opinion lacked supportability and consistency with the record as a whole, noting that treatment notes from the same day she provided her opinion indicated

6

plaintiff's behavior, judgment, and thought content were all normal. (R. 483).

The ALJ turned to opinions from plaintiff's psychiatrists. He rejected the first psychiatrist's letter stating that plaintiff's depression appeared to be worsening and such symptoms could interfere with work. The ALJ noted that the doctor had seen plaintiff on only one occasion and said she did not feel comfortable filling out paperwork regarding plaintiff's functioning. Plaintiff's more recent psychiatrist filled out a form in July 2021, giving plaintiff a GAF score indicating mild symptoms, but adding that plaintiff's mental condition precluded performance 15% or more of the workday in every category, that she would be off-task more than 30% of the workday, and absent 6 days or more per month due to impairments or treatment and that overall she could not obtain and retain competitive employment for 8 hours per day for 5 days per week. The ALJ found these limitations excessive when compared to the record and were not explained by the doctor's findings and were not consistent with his treatment notes. (R. 484-85).

There was an opinion from plaintiff's third psychiatrist, dated July 2022. The doctor filled out a form indicating plaintiff's symptoms would preclude performance 15% or more of the workday in the categories of understanding and memory and in sustained concentration and memory. She added that plaintiff would be off-task more than 30% of the workday, absent less than 2 days per month, and could be expected to perform a job 20% as efficiently without continuous supervision or undue interruptions/distractions when compared to an average worker. And that plaintiff was also limited to working no more than 3 to 4 hours a day. The ALJ felt the opinion was excessive, noting that the doctor said plaintiff's limitation went back to August 2014 despite having only seen plaintiff since February 2022 for two visits. The ALJ noted, further, that the opinion was as there was a gap in psychiatric treatment from about June/July 2021 to February 2022, that

treatment aside from that was generally conservative and relatively, and that treatment records leading up suggest that the plaintiff was noncompliant and did not suggest disabling level limitations, but rather showed that the plaintiff's mental status examinations were normal to fair. (R. 486).

The ALJ then relied on the testimony of the vocational expert that someone with the plaintiff's residual functional capacity could not perform plaintiff's past semi-skilled work as a teacher's aide (R. 487), but could still perform other jobs in the national economy such as: Day Worker (DOT#301.687-014/unskilled/medium /25,000 jobs); Laundry Worker (DOT#361.685-018 /unskilled/medium/30,000 jobs); Linen Room Attendant (DOT #222.387-030 /unskilled/medium /40,000 jobs). (R. 488). Accordingly, the ALJ determined that the plaintiff was not disabled and not entitled to disability insurance benefits under the Act. (R. 489).

## II.

The court's review of the ALJ's decision is "extremely limited." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022). If the ALJ's decision is supported by "substantial evidence," the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. *See* 42 U.S.C. § 405(g). The "substantial evidence" standard is not a high hurdle to negotiate. *Biestek v. Berryhill*, – U.S. –, –, 139 S. Ct. 1148, 1154 (2019); *Bakke v. Kijakazi*, 62 F.4th 1061, 1066 (7th Cir. 2023); *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). Indeed, it may be less than a preponderance of the evidence, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir.2007), and is only that much "evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). To determine whether "substantial evidence" exists, the court

reviews the record as a whole, but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving debatable evidentiary conflicts, or determining credibility. *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022); *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). Where reasonable minds could differ on the weight of evidence, the court defers to the ALJ. *Karr v. Saul*, 989 F.3d 508, 513 (7th Cir. 2021); *Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).

But, in the Seventh Circuit, the ALJ also has an obligation to build what is called an "accurate and logical bridge" between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir. 2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). The Seventh Circuit has explained that, even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that "logical bridge." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."); *see also Jarnutowski*, 48 F.4th at 774 (". . . the Commissioner argues, we should affirm the ALJ's decision because it was supported by the evidence. Possibly. But we cannot reach that conclusion from the ALJ's analysis."); *but see, e.g., Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018)("But we need not address either of those issues here because, even if [plaintiff] were correct on both counts, we may affirm on any basis

9

appearing in the record,....”); *Steimel v. Wernert*, 823 F.3d 902, 917 (7th Cir. 2016)(“We have serious reservations about this decision, which strikes us as too sweeping. Nonetheless, we may affirm on any basis that fairly appears in the record.”); *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)(“[District court] did not properly allocate the burden of proof on the causation element between the parties,...No matter, because we may affirm on any basis that appears in the record.”).

Of course, this is a subjective standard, and a lack of predictability comes with it for ALJs hoping to write opinions that stand up to judicial review. One reviewer might see an expanse of deep water that can only be traversed by an engineering marvel like the Mackinac Bridge. Another might see a trickle of a creek they can hop across with barely a splash.[2] But, the Seventh Circuit has also called this requirement “lax.” *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). All ALJs really need to do is “minimally articulate” their reasoning. *Grotts v. Kijakazi*, 27 F.4th 1273, 1276 (7th Cir. 2022); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016). “If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough.” *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985).[3] In this instance, the ALJ has

---

[2] By way of example, in the Seventh Circuit's ruling in *Jarnutowski*, 48 F.4th 769, two judges on the panel felt the ALJ had not adequately explained aspects of her reasoning while a third judge, dissenting, thought she did. The Magistrate Judge who reviewed the ALJ's decision at the district court level also felt the ALJ had adequately explained her reasoning. *Donna J. v. Saul*, No. 19 C 2957, 2021 WL 2206160, at *8 (N.D. Ill. June 1, 2021).

[3] Prior to Sarchet's “logical bridge” language, the court generally employed the phrase “minimal articulation” in describing an ALJ's responsibility to address evidence. *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985)(collecting cases). The court's focus was on whether an ALJ's opinion assured the reviewing court that he or she had considered all significant evidence of disability. In *Zblewski v. Schweiker*, 732 F.2d 75 (7th Cir. 1984), for example, the court “emphasize[d] that [it] d[id] not require a written
(continued...)

gone far beyond a "sketchy opinion", and has done enough.

## III.

The plaintiff has a long and winding list of criticisms regarding the ALJ's decision that she packs into three main arguments: (1) the ALJ failed to properly consider the evidence of record as a whole in assessing mental limitations at Step 3; (2) the ALJ's rejection of plaintiff's subjective statements rests upon improper "cherry-picking" and impermissible inferences; and (3) the ALJ again failed to support his assessment of treating source opinions, and improperly dismissed the statements of plaintiff's husband. While it seems unlikely, given the plaintiff's brief, that the

---

[3](...continued) evaluation of every piece of testimony and evidence submitted" but only "a minimal level of articulation of the ALJ's assessment of the evidence...in cases in which considerable evidence is presented to counter the agency's position." *Zblewski*, 732 F.2d at 79. In *Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985), the court rejected a plaintiff's argument that an ALJ failed to adequately discuss his complaints of pain and was more explicit about how far ALJs had to go to explain their conclusions:

> We do not have the fetish about findings that [the plaintff] attributes to us. The court review judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills. The ALJs work under great burdens. Their supervisors urge them to work quickly. When they slow down to write better opinions, that holds up the queue and prevents deserving people from receiving benefits. When they process cases quickly, they necessarily take less time on opinions. When a court remands a case with an order to write a better opinion, it clogs the queue in two ways—first because the new hearing on remand takes time, second because it sends the signal that ALJs should write more in each case (and thus hear fewer cases).
> The ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do....This court insists that the finder of fact explain why he rejects uncontradicted evidence. One inference from a silent opinion is that the ALJ did not reject the evidence but simply forgot it or thought it irrelevant. That is the reason the ALJ must mention and discuss, however briefly, uncontradicted evidence that supports the claim for benefits.

*Stephens*, 766 F.2d at 287 (citations omitted).

Much more recently, the Seventh Circuit explained that "the 'logical bridge' language in our caselaw is descriptive but does not alter the applicable substantial-evidence standard." *Brumbaugh v. Saul*, 850 F. App'x 973, 977 (7th Cir. 2021).

plaintiff left any arguments in her bag, any she failed to raise are deemed waived. *Milhem v. Kijakazi*, 52 F.4th 688, 693 (7th Cir. 2022); *Jeske v. Saul*, 955 F.3d 583, 597 (7th Cir. 2020).

### A.

Plaintiff first contends that the ALJ cherry-picked evidence and drew flawed inferences in order to find that she was moderately limited in the areas of understanding, remembering or applying information; interacting with others; concentrating, persisting or maintaining pace; and adapting or managing oneself. [Dkt. #16, at 9]. More specifically, she complains that the ALJ relied on an impermissible inference to question plaintiff's allegation that she isolates. According to the plaintiff, the "[r]ight off the bat, he relied upon an inference that has been rejected by the courts," citing *Lanigan v. Berryhill*, 865 F.3d 558, 565 (7th Cir. 2017) for the proposition that ALJs ought not to draw conclusions about a plaintiff's ability to work full time based on part-time employment. *See also Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) (explaining that a claimant's "brief, part-time employment" did not support the conclusion "that she was able to work a full-time job, week in and week out, given her limitations").

But the plaintiff's argument is based on a misreading of the ALJ's decision. The ALJ did not say plaintiff's part-time work indicated a capacity for full-time work. He said, understandably and logically, that he doubted plaintiff's allegations that her symptoms were so severe that she had to keep herself isolated when she spent a few hours each day as a recess aid. (R. 473). *Jeske*, 955 F.3d at 592 (". . . an ALJ is not forbidden from considering statements about a claimant's daily life. In fact, agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities."); *Kuykendoll v. Saul*, 801 F. App'x 433, 439 (7th Cir. 2020)(". . . all the ALJ said about [plaintiff's] activities . . . was that they 'are not

limited to the extent one would reasonably expect given the functional deficits alleged.' This is hardly equating the activities with the ability to work full time."); *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016)(". . . it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether 'testimony about the effects of his impairments was credible or exaggerated.'").

From there the plaintiff takes the ALJ to task for failing "to mention that Dr. Hakimi, Plaintiff's treating psychiatrist, had actually encouraged her to leave her part-time work because of her extreme symptoms." [Dkt. #16, at 9]. But, that's not what the evidence shows. Actually, in August 19, 2016, when plaintiff was a substitute teacher – some time before she was a recess monitor – she told her psychologist she was anxious about having to substitute teach two more years to qualify for a $300-month pension benefit. The psychologist felt it was not worth it, and suggested she instead get a part-time job doing something she enjoyed, and she would make more than $300 a month. (R.435, 439). Nothing was said about plaintiff self-isolating and, obviously, when a psychologist recommends a part-time job, he is not endorsing any such restriction.

Next, the plaintiff moves on to the ALJ's finding that she had a moderate impairment in understanding, remembering, or applying information, again complaining that the ALJ equated her ability to work part-time as a recess monitor, as well as drive short distances, and perform a handful of simple chores "is certainly not indicative of an ability to sustain work-related functions throughout an eight-hour workday." [Dkt. #16, at 9-10]. But, again, the plaintiff is misreading the ALJ's decision. The ALJ not only explained at length how plaintiff's many activities support a finding of no more than a moderate impairment in this area, but added that treatment notes showed her to have no more than a mild cognitive impairment. And, as before, the ALJ said absolutely

nothing about the plaintiff's activities indicating she could work full-time. (R. 474). *Jeske*, 955 F.3d at 592 (". . . an ALJ is not forbidden from considering statements about a claimant's daily life. In fact, agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities."); *Kuykendoll*, 801 F. App'x at 439 (". . . all the ALJ said about [plaintiff's] activities . . . was that they 'are not limited to the extent one would reasonably expect given the functional deficits alleged.' This is hardly equating the activities with the ability to work full time."); *Alvarado*, 836 F.3d at 750 (". . . it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether 'testimony about the effects of his impairments was credible or exaggerated.'").[4]

Plaintiff then points to "frequent documentation of deficits in the record." But the evidence the plaintiff cites documents no more than a mild impairment:

> November 24, 2015 – perception: nothing abnormal; thought processes: goal directed/coherent; level of consciousness: alert; concentration: able to attend to task; insight: mild impairment/intellectual insight; judgment: no impairment/critical. (R. 415-4).

> July 15, 2021 – Mild cognitive impairment (R. 783), exam within normal limits aside from attention which was distracted (R. 783-84). Testing revealed no cognitive impairment. (R. 790-92).

[Dkt. #16, at 10]. Obviously, neither of those reports documents anything that would undermine the ALJ's opinion. The third piece of evidence plaintiff cites is her claim that her concentration and memory are bad. (R. 503). But the plaintiff bears the burden to prove she is disabled by producing medical evidence. 42 U.S.C. § 423(d)(5)(A)("An individual's statement as to pain or other

---

[4] Plaintiff repeats this same unsupported argument, again perhaps based on a somewhat careless reading of the ALJ's opinion, in connection with the ALJ's finding of moderate restrictions on interacting with others and concentration, persistence, and pace. [Dkt. #16, at 10-11].

14

symptoms shall not alone be conclusive evidence of disability...."); 20 C.F.R. §§ 404.1529(a); 416.929(a); *Gedatus*, 994 F.3d at 905 (7th Cir. 2021); *Karr*, 989 F.3d at 513 (7th Cir. 2021)(plaintiff must "identify[ ] ... objective evidence in the record" that she is disabled); *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010). As for "frequent documentation", the record here consists, with precious few exceptions, of normal mental status exams or findings of slight or mild impairments. (R. 388, 398, 399, 400, 408, 410, 412, 414, 415, 417, 436, 439, 813, 819, 825, 835, 845, 859, 877, 881, 895, 910, 918, 987, 991, 1002).

While it is true that the Seventh Circuit has warned against ALJs relying too much on normal [Dkt. #16, at 10], brief mental status examinations, because such notations only describe how an individual presented at a particular appointment, *Gerstner v. Berryhill*, 879 F.3d 257, 261-262 (7th Cir. 2018), by the same token, experience teaches that mental impairment disability cases rarely have more extensive evidence than that. Here, in addition to such overwhelmingly normal or mild mental status reports, plaintiff was actually given a cognition test – and she passed easily. (R. 790-92). But, in any event, this is not a case where the ALJ ignored diagnoses of depression and anxiety as in *Gerstner*. He clearly acknowledged them. He simply thought– understandably so, given the evidence – that the record failed to indicate that the resulting symptoms were severe enough to preclude work.

Contrary to how plaintiff's brief strains to characterize it, this is not a record where there are alternating good and bad days; it's not nearly half and half as the court hypothesized in *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008)("Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."). It is not a record where the ALJ focused on just "a number of hopeful" remarks. *Compare Bauer*, 532 F.3d

at 609. Again, plaintiff's mental status exams are – almost exclusively – unremarkable, at appointment after appointment. While, plaintiff has been diagnosed with a mental impairment, the key is how limiting the symptoms of that impairment are. *See Sebranek v. Kijakazi*, No. 20-3399, 2022 WL 520786, at *4 (7th Cir. Feb. 22, 2022)("[Plaintiff's] argument conflates the psychologists' diagnoses of her mental disorders with their assessments of how limiting those disorders are."); *Harris v. Saul*, 835 F. App'x 881, 886 (7th Cir. 2020)(generally normal mental status exam results). Here, far more than "substantial evidence" leads to the conclusion that plaintiff's symptoms are not disabling.

### B.

Next, the plaintiff takes the ALJ to task for failing to consider whether her "mental illness might impede her from regularly taking her medications . . . ." [Dkt. # 16, at 11]. It's not clear why this is an issue. While the ALJ discussed plaintiff's medication regime throughout his lengthy and thorough decision (R. 472, 474, 477, 478, 480, 481), he did not criticize plaintiff for failing to take her medications. As such, a case like *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006) – where Judge Posner cited some medical publications for the proposition that bipolar disorder "may prevent the sufferer from taking her prescribed medicines," 454 F.3d at 630 – is not really applicable. Moreover, as the plaintiff concedes and the ALJ correctly pointed out, no doctors reported that plaintiff was failing to take her medications.

The plaintiff then complains that the ALJ noted that GAF scores in the 60 to 65 range—indicative of mild to moderate symptoms (R. 482) – and points out that the Seventh Circuit has described GAF scores as a mere "snapshot," explaining that they are useful for planning treatment but do not reflect the clinician's opinion of functional capacity. [Dkt. #16 , at 13]. But,

while one GAF score might qualify as a "snapshot", that ignores the overall record. As the ALJ more than adequately detailed (R. 474, 475, 478, 479, 480, 481, 482), time after time, plaintiff's impairment and symptoms were described as "mild." (R. 388, 398, 399, 400, 408, 410, 412, 414, 415, 417, 436, 439, 813, 819, 825, 835, 845, 859, 877, 881, 895, 910, 918, 987, 991, 1002).

From there, the plaintiff contends that, given the ALJ's finding that she had a moderate limitation in maintaining concentration, persistence, or pace, it was improper for the ALJ to account for that by limiting the plaintiff to unskilled work that did not require a specific production rate. But "moderate limitations, on their own, do not mean a claimant is disabled." *Apke v. Saul*, 817 F. App'x 252, 258 (7th Cir. 2020); *see also Capman v. Colvin*, 617 Fed. Appx. 575, 579 (7th Cir. 2015) ("A moderate limitation is not a complete impairment."). More importantly, as the Seventh Circuit has explained:

> A "moderate limitation" is defined by regulation to mean that functioning in that area is "fair." 20 C.F.R. Pt. 404, Subpt. P, App. 1. As the Commissioner points out, "fair" in ordinary usage does not mean "bad" or "inadequate." So a "moderate" limitation in performing at a consistent pace seems consistent with the ability to perform simple, repetitive tasks at a consistent pace.

*Pavlicek*, 994 F.3d 777, 783 (7th Cir. 2021). Similarly, a "fair" concentration does not necessarily rule out unskilled work not requiring a specific production rate, so the ALJ adequately accounted for plaintiff's limitations with his RFC.

## C.

The plaintiff then moves on to criticisms of the ALJ's treatment of the medical opinion evidence. She argues that the ALJ failed to support his assessment of treating source opinions from her nephrologist, Dr. Kramer, and her psychiatrist, Dr. Halaris. According to plaintiff, the ALJ rejected Dr. Kramer's opinion that plaintiff would be unable to sustain work due to poor

concentration, fatigue, and poor memory due to major depression, that she would have a severe

limitation dealing with work stress, and that she would be absent more than three times a month due

to impairments or treatment "simply because she is not a mental health professional . . . [and

because] Dr. Kramer's opinion [wa]s unsupported and inconsistent with the record." [Dkt. #16 , at

14-15].

But, contrary to the plaintiff's reading of the ALJ's opinion, the ALJ went far beyond a

superficial gloss, and went through each factor the regulations required him to consider in assessing

the nephrologist's opinion, 20 C.F.R. § 404.1527(c)(1-6):

> As to the length of treatment and frequency of examination, it is noted that Dr.
> Kramer has an ongoing treatment relationship with the [plaintiff] since October
> 2010 and the [plaintiff] sees Dr. Kramer about twice a year per testimony. As to the
> nature and extent of the treatment relationship, Dr. Kramer monitors the [plaintiff]'s
> kidney disease per testimony and prescribes medication for her kidneys as shown
> in the record. Dr. Kramer also prescribed the [plaintiff] psychotropic medication,
> though the [plaintiff] also follows with psychiatry. Still, as to Dr. Kramer's degree
> of specialization, Dr. Kramer is a nephrologist and does not specialize in mental
> health, such as a psychiatrist or psychologist, and Dr. Kramer's assessment primarily
> addresses the [plaintiff]'s mental limitations from depression, as opposed to her
> kidney disease, resulting in an inability to work. In addition, I find that Dr. Kramer's
> opinion lacks supportability and consistency with the record as a whole. As such,
> I give Dr. Kramer's opinion no weight as to the work preclusive limitations
> assessed, including as to absences, off-task time, and severe limitation handling
> stress. Notably, Dr. Kramer did not cite to the record for support of her assessment
> of such significant limitations. Though Dr. Kramer observed the [plaintiff] to have
> be sad and/or nervous at times (Ex 2F, 32; Ex 10F, 8), there is no indication of such
> significant symptoms being observed in Dr. Kramer's treatment notes for a
> continuous twelve month period. Rather, Dr. Kramer's own treatment notes show
> that the [plaintiff] was generally observed to have normal judgment, behavior, and
> thought content (see, for example, Ex 3F, 2; Ex 5F, 6, 19; Ex 10F, 7, 204).
> Furthermore, Dr. Kramer's treatment notes from that same date that this form was
> completed observed that the [plaintiff]'s behavior was normal and as was her
> judgment and thought content, though she seemed sad (Ex 10F, 8). Moreover, the
> [plaintiff]'s treatment records with Dr. Kramer show no kidney/transplant issues or
> side effects from her kidney medication to suggest such significant limitations,
> including as to absences and off task time. Rather, the record shows that the
> [plaintiff]'s kidney disease and kidney function were generally noted as stable (Ex

18

> 5F, 21; Ex 10F, 57, 63, 74, 91, 207). Overall, I find that there is no basis for the substantial limitations assessed by this opinion other than the [plaintiff]'s subjective allegations.

(R. 483). The ALJ's consideration of the relevant factors was not only thorough, but logical.

For example, the regulations state that ALJ's "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5). The ALJ noted that Dr. Kramer was not a mental health specialist. He didn't dismiss her opinion out of hand as a result, but went on to consider the other relevant factors. If an ALJ is forbidden to make the observation that a nephrologist is not as well-versed in mental health symptoms as a psychiatrist, there's really no point to the regulation. *See, e.g., Gebauer v. Saul*, 801 F. App'x 404, 409 (7th Cir. 2020); *White v. Barnhart*, 415 F.3d 654, 658 (7th Cir. 2005). As for whether Dr. Kramer's opinion was unsupported and inconsistent with the record, it certainly was. But the ALJ didn't just say that. He cited to the record, which, as already noted, generally depicts mild symptoms. (R. 388, 398, 399, 400, 408, 410, 412, 414, 415, 417, 436, 439, 813, 819, 825, 835, 845, 859, 877, 881, 895, 910, 918, 987, 991, 1002). As always, the most important factors in weighing a medical opinion are "supportability" and "consistency" with the evidence in the record. *Albert*, 34 F.4th at 614; *Karr*, 989 F.3d at 511.

The plaintiff also has a number of issues with the ALJ's consideration of the opinion from Dr. Halaris, her psychiatrist. Completing a form provided by plaintiff's counsel – *see Trottier v. Saul*, 809 F. App'x 326, 327 (7th Cir. 2020)(criticizing doctor's opinion expressed by checking boxes rather than explaining how medical evidence supported his conclusions); *Urbanek v. Saul*, 796 F. App'x 910, 915 (7th Cir. 2019)(questioning persuasive value of a checklist opinion); *Varga*,

794 F.3d at 816 (checklist observations are ... "less useful to an ALJ" than a doctor's narrative summary) – Dr. Halaris indicated he felt plaintiff was unable to work due to her mental impairments, and more specifically, that they would precluded performance 15% or more of the workday in every category, that plaintiff would be off-task more than 30% of the workday, would be absent 6 days or more per month, and that she could not obtain and retain competitive employment for 8 hours per day, for 5 days per week. (R. 777-80). The ALJ gave no weight to the doctor's opinion for a number of reasons.

According to the plaintiff, the ALJ "failed to elaborate on his findings." [Dkt. #15, at 15]. But that's a mischaracterization, as the ALJ provided a lengthy and thorough analysis of Dr. Halaris's less-than-thorough and less-than-lengthy check-box opinion. Here is what she said:

> The [plaintiff]'s psychiatrist, Angelos Halaris, M.D., completed a Mental Residual Functional Capacity Statement dated in July 2021 (Ex 8F). In the form, Dr. Halaris indicated that the [plaintiff]'s diagnoses included major depressive disorder, but indicated a GAF score of 65 (indicative of only mild symptoms/limitations). Otherwise, Dr. Halaris found that the [plaintiff]'s mental condition precluded performance 15% or more of the workday in every category, that she would be off-task more than 30% of the workday, and absent 6 days or more per month due to impairments or treatment and that overall she could not obtain and retain competitive employment for 8 hours per day for 5 days per week. After review, I give the assessment of the [plaintiff]'s GAF score of 65 limited weight. Still, it is noted that this score suggests only mild symptoms/limitations and the residual functional capacity above is reflective of moderate level limitations. Otherwise, I give no weight to Dr. Halaris's other assessments of substantial limitations, including in the four functional areas, off-task time, and absences. As to the length of treatment and frequency of examination, Dr. Halaris did not complete this box on the form and left it blank (see Ex 8F, 1). However, he appears to have started treatment of the [plaintiff] around February 2015 and then resumed around March 2019 through July 2021, ranging from seeing the [plaintiff] about one to two times a year (at times with a medical resident/fellow). As to his specialization, Dr. Halaris is a psychiatrist. Still, the assessment of such significant mental limitations, including such to preclude performance of all mental abilities for work (understanding and memory, sustained concentration and memory, social interaction, and adaption) as well as off-task time and absences appears excessive when compared to the record. Dr. Halaris did not cite to the record to support his

assessments, which essentially consists of check marks on a form with little to no explanation of his findings, including as to excessive absences and off-task time. Moreover, his opinion appears to be somewhat internally inconsistent given that he found that the [plaintiff]'s GAF score was 65 (indicative of some mild symptoms), but also opined significant limitations in the [plaintiff]'s mental abilities to work. Further, Dr. Halaris's opinion does not appear to be consistent with the record as a whole, including his own treatment notes. For example, the [plaintiff]'s mini-mental status examination from the date that he completed this form showed that the [plaintiff] scored a perfect score, a 30 out of 30, though it was noted that the [plaintiff] appeared depressed and was distracted and complained of forgetfulness (Ex 9F, 4, 10). At a follow-up visit with Dr. Halaris two weeks after the form was completed, on July 29, 2021, the [plaintiff] reported feeling better and had a normal mental status examination (Ex 9F, 7, 8). I do not find that this is suggestive of the substantial limitations evaluated by Dr. Halaris, including his finding of work preclusive deficits in understanding and memory and sustained concentration in memory. There is a waxing and waning of the [plaintiff]'s symptoms shown in the record and this is considered in the residual functional capacity, but I do not find that the record as a whole suggests that the [plaintiff]'s mental limitations rise to the marked level, with it being noted that the [plaintiff]'s treatment is generally conservative and infrequent with no evidence of protracted exacerbations. Further, the record as a whole does not suggest that the [plaintiff] has such significant limitations in her mental functional abilities as assessed by Dr. Halaris (including in understanding and memory, sustained concentration and memory, social interaction, and adaption), as discussed herein. Rather, the [plaintiff] retains the concentration and memory to drive for short distances (testimony; Ex 3E; Ex 5E), which includes having the memory to operate her vehicle and what signs and signals mean, understanding her destination and applying directions on how to get there, concentrating on the road to identify and react to multiple stimuli, including driving hazards, to make rapid, accurate, and safe decisions, and maintaining pace while driving to follow directions to reach her destination. She also has the mental capacity to perform semi-skilled work since the alleged onset date as a school recess monitor, which also involves interacting with others and adapting to her work environment (which she described as taking children in and out for recess, which is presumably a hectic environment).

(R. 484-85). The plaintiff might not agree with the ALJ's assessment, but the claim he failed to elaborate on his findings is patently false.

Plaintiff then complains that the ALJ "appeared to base his rejection of this opinion, at least in part, on Dr. Halaris' failure to indicate the length of the treatment relationship on the form." [Dkt. #16, at 15]. Yes, the ALJ commented on the doctor's failure to answer that particular question on

the form from plaintiff's counsel, but went on to indicate, on Dr. Halaris's behalf, that the doctor began treating the plaintiff "around February 2015 and then resumed around March 2019 through July 2021, ranging from seeing the [plaintiff] about one to two times a year . . . ." (R. 484).

The plaintiff also complains that the ALJ failed to explain why he believed Dr. Halaris's opinion was inconsistent with the record. [Dkt. #16, at 15]. But the ALJ provided examples of how Dr. Halaris's treatment notes departed from his very dire assessment of plaintiff's condition in the check-box form. (R. 484-85). And, the ALJ alluded to his lengthy summary of the medical record, including the doctor's treatment notes. (R. 485). Again, those are both perfectly acceptable rationales for rejecting a medical opinion. *Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022); *Pavlicek*, 994 F.3d at 781; *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019).

Finally, the plaintiff complains that the ALJ rejected the corroboratory statements provided by her "husband, simply because he is not a medical professional, or impartial." [Dkt. #16, at 15]. R. 486. Both of those points, however, are true: plaintiff's husband is not a doctor and he is perhaps biased by virtue of his relationship to the plaintiff. Social Security disability claimants – and their families – have an obvious incentive to lie or exaggerate. Obviously, both expertise and bias enter into any consideration of testimony; it would be foolhardy to ignore those factors. As to bias, which seems to be the plaintiff's focus, the Seventh Circuit has acknowledged that Social Security disability claimants and their families have an incentive to lie or exaggerate. *Alvarado v. Colvin*, 836 F.3d 744, 749 (7th Cir. 2016); *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015); *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir.2006). But, contrary to plaintiff's reading of the Opinion, the ALJ did "not automatically . . . discount[] [plaintiff's husband's testimony] for bias." *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013). At the point where the plaintiff seems to have stopped

22

reading the ALJ's Opinion, the ALJ went on to note that plaintiff's husband:

> said that the [plaintiff] is constantly sick. However, the record does not show the [plaintiff] having an ongoing problem with sickness (the record shows generally infrequent treatment) and the [plaintiff]'s kidney disease was generally evaluated as stable (Ex 5F, 21; Ex 10F, 57, 63, 74, 91, 207). The [plaintiff]'s husband reported that the claimant only goes out alone on rare occurrences. Nonetheless, an inability to go out alone is not actually shown in the record, where the [plaintiff] has been able to go out alone to go to her job as a school recess monitor as well as to attend medical appointments. [Plaintiff's husband] also said that the [plaintiff's] leg muscles are weak, but a lack of leg muscle strength is not documented in the actual medical record (see, for example, Ex 10F, 134).

So, the statement from the plaintiff's husband was clearly contradicted not only by the medical record – which shows either no muscular complaints or normal muscle strength and tone (R. 851, 868, 901, 931), but by plaintiff's activities, such as part-time work. As such, the ALJ had a valid reason to reject it. And, again, as with other sections of the ALJ's opinion that the plaintiff targets, there was more to the ALJ's reasoning than the plaintiff noticed or has acknowledged.

## CONCLUSION

For the foregoing reasons, the ALJ's decision is affirmed.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 6/7/23